[S. F. No. 19142.   In Bank.   June 4, 1956.]

JACK W. BRADSHAW, Appellant, v. CALIFORNIA EM-
PLOYMENT STABILIZATION COMMISSION et al.,
Respondents.

Herbert Pothier, Marcel E. Cerf, Robinson & Leland for Appellant.

Arthur J. Goldberg, Nutter & Smith, Ralph Nutter and Charles P. Scully as Amici Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, William L. Shaw and Vincent P. Lafferty, Deputy Attorneys General, Cooper, White & Cooper, Sheldon G. Cooper, George A. Helmer, Robert M. Raymer and Richard Logan for Respondents.

Downey, Brand, Seymour & Rohwer, Clyde H. Brand and J. Richard Glade as Amici Curiae on behalf of Respondents.

SHENK, J.—The petitioner-appellant appeals from a judgment entered after an order sustaining a demurrer to his petition for a writ of mandate to vacate a decision of the California Unemployment Insurance Appeals Board denying his claim for unemployment insurance benefits.

For reasons of economy the petitioner was discharged from his job with the San Francisco Chronicle on or about November 29, 1952. Pursuant to a collective bargaining agreement between his union and the Chronicle, he received upon

his discharge three items of compensation in addition to his final week's salary: (1) pay for the fraction of his next annual vacation that had accrued as of the date of his discharge (hereinafter called "vacation pay"); (2) pay in lieu of two weeks' notice; and (3) "dismissal pay" in an amount dependent upon his length of service.

The petitioner filed for unemployment insurance benefits. The claims examiner of the Department of Employment decided that since he had received vacation pay, pay in lieu of notice and dismissal pay equal to his salary for $41\frac{2}{3}$ working days, he would not qualify for benefits until $41\frac{2}{3}$ working days after his discharge. After a hearing, a Department of Employment referee affirmed the denial of benefits. The Unemployment Insurance Appeals Board in turn affirmed the referee's decision and denied benefits. Bradshaw petitioned the superior court for a writ of mandate under Code of Civil Procedure, section 1094.5, to vacate the decision of the Appeals Board and grant him benefits for the $41\frac{2}{3}$ days covered by the supplemental payments. A demurrer to the petition was sustained, Bradshaw elected not to amend and judgment was entered for the respondents.

The petitioner does not now contest the decisions denying him benefits because he received vacation pay and pay in lieu of notice. This court will therefore consider only the propriety of denying unemployment benefits for a period equal to the number of days' dismissal pay he received.

This case calls for an interpretation of section 1252 of the Unemployment Insurance Code. In part, that section provides: "An individual is 'unemployed' in any week during which he performs no services and with respect to which no wages are payable to him . . . ." Section 1251 provides that unemployment compensation benefits are payable to "unemployed individuals." It is conceded by the petitioner that dismissal payments under the contract are "wages" within the meaning of that term as used in section 1252. The question then is whether dismissal payments are payable "with respect to" a period before the employee's date of discharge or "with respect to" a period after that date. The petitioner contends that dismissal payments are made "with respect to" the weeks during which he admittedly performed services for the Chronicle. The respondents contend that such payments are made "with respect to" the weeks following the petitioner's discharge. Decisions in other states on the subject herein discussed are not helpful. It is stated

in 25 American Law Reports 2d at page 1070 that a general rule on the subject "is not justified."

The state's purpose in providing unemployment insurance is "to reduce involuntary unemployment and the suffering caused thereby to a minimum." (Unempl. Ins. Code, § 100.) An unemployed person who satisfies the requirements of the Unemployment Insurance Act is entitled to receive from the Unemployment Fund payments reasonably sufficient to tide him over until he can secure employment.

The parties to the contract involved in this proceeding obviously intended the dismissal payments provided for therein to serve the same purpose as unemployment compensation, namely, to tide the discharged employee over until he could secure employment. Although dismissal pay coverage under the contract was broader than coverage under the Unemployment Insurance Act, the fact still remains that an award of unemployment benefits to the petitioner for the dismissal period would seem to duplicate the dismissal payments he has received.

Section 1252 contemplates that wage payments are to be allocated to specific periods. The week "with respect to which" a wage payment is made by an employer to an employee depends upon the provisions of the employment contract. However, interpretations of employment contracts and of the Unemployment Insurance Act that result in duplication of payments to a discharged employee are not encouraged. This principle finds support in decisions of this court involving duplication of workmen's compensation by unemployment disability benefits. (*Garcia* v. *Industrial Acc. Com.*, 41 Cal.2d 689 [263 P.2d 8] ; *Aetna Life Ins. Co.* v. *Industrial Acc. Com.*, 38 Cal.2d 599 [241 P.2d 530] ; *Bryant* v. *Industrial Acc. Com.*, 37 Cal.2d 215 [231 P.2d 32].) The policy against duplication of payments should not be thwarted by any so-called liberal construction of the act, especially when such construction is not justified by the language of the contract. Unemployment insurance was not intended to protect employees already protected for the same period by their private contracts.

The policy against duplication of payments would require an employee who claims what appear to be duplicating payments to show that there is no duplication. The petitioner has not done so. The record discloses that he has seen fit to rely solely on the language of the contract. That lan-

guage alone is insufficient to establish that the dismissal payments were made ''with respect to'' a period before discharge and thus would not be duplicated by an award of unemployment compensation.

■ A holding that dismissal payments should be disregarded in determining whether an employee is entitled to unemployment benefits would create an anomalous distinction between dismissal pay on the one hand and ''in lieu of notice pay'' and ''vacation pay'' on the other. There is authority in this state to the effect that the receipt of ''vacation pay'' or ''in lieu of notice pay'' temporarily disqualifies an employee from claiming unemployment insurance benefits. (See *Shand* v. *California Emp. Stab. Com.*, 124 Cal.App.2d 54 [268 P.2d 193]; *Jones* v. *California Emp. Stab. Com.*, 120 Cal.App.2d 770 [262 P.2d 91].) By analogy dismissal pay should have the same effect. The petitioner, however, notes that in *Gilliam* v. *California Emp. Stab. Com.*, 130 Cal.App. 2d 102 [278 P.2d 528], one sort of supplemental payment was held not to disqualify the recipient from claiming unemployment insurance benefits. In that case the employees had the option of working without vacation and receiving pay in lieu thereof. Upon discharge they were given pay in lieu of a vacation they had not taken during a prior period. The court distinguished the Shand and Jones cases by pointing out that in those cases the employee while he was employed did not have the option of taking extra pay in lieu of vacation —he could only be sure of getting that extra pay if he was discharged. The factual situation was obviously different in the Gilliam case, and the court there concluded that ''in lieu'' vacation payments could be allocated to a period before discharge notwithstanding the Shand and Jones cases. The petitioner contends that dismissal pay is more analogous to ''in lieu'' vacation pay than to the normal vacation pay involved in the Shand and Jones cases. This contention is untenable. As noted, the basis for the Gilliam award was the employee's option while he was employed to receive the supplemental payments. In contrast, the dismissal payments made to the petitioner were not available to him unless and until his employment was terminated.

The petitioner complains that the Unemployment Insurance Appeals Board has taken inconsistent positions with respect to the treatment of dismissal pay. It is said that when determining whether a claimant has qualified for benefits by earning sufficient money during a base period prior to his discharge

(see Unempl. Ins. Code, §§ 1277 and 1281), the Appeals Board allocates dismissal pay to the period when it is received. It is enough to say that the propriety of the board's practice in allocating dismissal pay for the purpose of determining the claimant's earnings during the base period is not involved in the present proceeding.

Both contracting parties contend that the allocation urged by the opposition is in violation of the constitutional prohibition against impairment of the obligation of contracts. An affirmance of the judgment in this case will not affect the rights of the petitioner under his employment contract. His right to dismissal payments will not be impaired. Nor would the employer be forced to make two payments under the employment contract in the event of a reversal.

It is concluded that the Appeals Board and the superior court properly construed the statute and held that, as a matter of law on the undisputed facts, the receipt of dismissal pay temporarily prevented the petitioner from qualifying for unemployment benefits.

The judgment is affirmed.

Spence, J., and McComb, J., concurred.

SCHAUER, J.—I concur in the judgment and, generally, in the opinion except insofar as it may be deemed to indicate approval of *Gilliam* v. *California Emp. Stab. Com.* (1955), 130 Cal.App.2d 102 [278 P.2d 528].

CARTER, J.—I dissent.

The majority opinion fails to give the liberal construction required of unemployment insurance laws (*Garcia* v. *Industrial Acc. Com.*, 41 Cal.2d 689, 693 [263 P.2d 8]), ignores the nature of dismissal pay and is contrary to the trend of authority elsewhere. It seems clear to me that where, as here, compensation for services performed is deferred until after an employee is discharged, and then paid to him, it does not constitute payment for such services during any period of time after discharge with respect to which wages are payable to him and hence he is entitled to unemployment compensation under Unemployment Insurance Code, section 1252, from the date of his discharge.

We must examine the collective bargaining agreement under which petitioner was entitled to dismissal pay, vacation pay and two weeks' notice of discharge or pay, because the nature

of those benefits is a factor in ascertaining the meaning of section 1252, *infra,* of the Unemployment Insurance Code, which defines "unemployment." That agreement provides that employees may be discharged for cause or economy. When the employer contemplates a discharge the "employee shall be given two (2) weeks' notice (or two (2) weeks' pay in lieu thereof). . . ."

"Section 7. DISMISSAL PAY. (a) When an employee other than those exempted from the terms of this contract as herein provided is discharged, he shall receive a cash dismissal payment *in a lump sum* in accordance with the following schedule *for years of continuous and uninterrupted employment*: . . ..

"(b) From the dismissal pay the publisher may deduct any levy or tax to which the employee is subject under local, state or federal legislation.

"(c) Dismissal pay shall be computed at the highest weekly salary (exclusive of bonuses and payments for special work) for the fifty-two (52) weeks previous to discharge. . . . VACATIONS. (a) Employees shall receive one week's vacation with pay after six months' continuous employment; two weeks' vacation with pay after one year's continuous employment. Employees who have been continuously employed for three years as of October 15th in the year which his vacation is scheduled shall receive three weeks' vacation with pay." (Emphasis added.) Thus it is seen the dismissal pay is payable in a lump sum and is computed on the length of prior service and the amount of pay during that service. This is, in effect, a payment of deferred wages or wages held back by the employer. It is not pay for the future after the employee is discharged. It is somewhat analogous to pensions which are considered as deferred compensation for services already rendered. (*Wallace* v. *City of Fresno,* 42 Cal.2d 180, 184 [265 P.2d 884].) No doubt, in the negotiations leading to the agreement in fixing wages, consideration was given to the dismissal pay.

In the above light we look at section 1252 which provides: "An individual is 'unemployed' in any week during which he performs no services and with respect to which no wages are payable to him. . . ." (Unempl. Ins. Code, § 1252.) The employee—petitioner—performed no services and no wages were paid to him with respect to any week during which he performed no services because the dismissal pay was not for time after the discharge, it being deferred wages, and was not allocated to any week after discharge because

it was payable in a lump sum. It may reasonably be said that the week with respect to which dismissal pay is payable, means weeks prior to the discharge during which the employee earned the benefits of the dismissal pay, and hence that pay is not for time after discharge; that the dismissal pay is like a compulsory savings plan and the employee who obtains the benefits of such a plan is no less eligible for unemployment compensation than a worker who can draw on his private savings. As I see the problem, the foregoing interpretation of the unemployment insurance law is soundly reasonable. That being the case, the liberal construction of those laws in favor of the employee, which is required (*Garcia* v. *Industrial Acc. Com.*, *supra*, 41 Cal.2d 689, 693), compels the adoption of such construction of them. The majority seems to feel that if unemployment compensation is allowed in this case there will be a double payment for the same thing—involuntary idleness—one from the state and the other from the employer. That is not true. Assuming that the sums payable under the agreement are for unemployment, still it is reasonable to say that it is in addition to unemployment compensation inasmuch as the latter is no more than a bare subsistence. Moreover, the argument of the majority is based on the false premise that unemployment compensation is payable only where the employee is needy when obviously his financial standing has nothing to do with it. He is entitled to the compensation no matter how much he is worth and, as seen, the sum payable under the agreement is in effect compulsory savings from his past wages where the employer acts as banker. He is not, therefore, being paid double, for the payment under the agreement is from his own money. Certainly if the employer had deposited a portion of the employee's wages in a trust fund to be paid to him only in the event of unemployment, it could not be claimed that he was not entitled to unemployment compensation. The provident as well as the improvident employee is entitled to unemployment compensation under the law. Why should he be any the less so when he is provident because an agreement between his union and his employer makes him so with the cooperation of his employer?

The construction of the statute in accord with the above discussion has been followed in other states. In *Ackerson* v. *Western Union Tel. Co.*, 234 Minn. 271 [48 N.W.2d 338], it was held that employees discharged because of mechanization and paid "severance" pay based on the period of prior

service under a collective bargaining agreement, the same as the dismissal pay here, were entitled to unemployment compensation under an unemployment compensation statute the same as ours. The court said: "Section 268.04, subd. 23, provides that an individual shall be deemed unemployed in any week in which he performs no service *and* with respect to which no wages are payable to him. It is clear that from the use of the conjunctive 'and,' before an individual may be deemed to be unemployed, two things must exist: (1) He must perform no service during the week; and (2) he must be paid no wages for the week. In the case now before us, the first of those requirements clearly exists. Upon election to receive severance pay, the employment was completely severed. No claim is made that other employment was obtained. The employe was registered for work. So far as her former employer was concerned, she could do as she pleased from the date of separation. Relator claims, however, that the second prerequisite to 'unemployment' is lacking, in that severance pay constitutes wages for the number of weeks following the employe's separation which have been used to compute the amount thereof. . . . Suffice to say that it is the declared public policy of our state, as shown by the legislative declaration of public policy in the act, § 268.03, that benefits are intended to extend to those who are unemployed through no fault of their own. . . . In the case now before us, relator was not only legally obligated under its contract to make the severance payments upon the election of the discharged employes to receive them, but the payments were not designated as wages for a specific future period of time. . . . Severance pay was in no way related to or dependent upon the employe's employment status after separation. She received the payment even though she might secure a job the next day. It is true that the amount was measured by the length of service, but there may have been many reasons for adopting the length of service as the yardstick in determining the amount of severance pay due a discharged employe. . . . It is undoubtedly true that one of the objectives of dismissal or severance pay, such as we have to deal with here, is to ease the employe's financial burden while looking for a new job. However, there are other objectives which we must also keep in mind in considering the nature of such payment. Partial compensation for loss of seniority rights; loss of possible pension rights; compensation for retraining or acquiring new skills; and many others

could be mentioned. Relator undoubtedly considered the desirability of retaining its trained personnel until the job of mechanization could be completed. It is reasonable to assume that in arriving at a contract by collective bargaining, under which relator became obligated to make such payments, it did so with full knowledge of the advantages to be gained by it in making such payments, without any strings tied to it, in return for the continued service of its employees until the time arrived when such services could be dispensed with.

"Relator argues that to allow claimants to recover benefits under these circumstances is to penalize relator by imposing a double liability under the contract, namely, payment of severance pay, and the adverse effect it will have upon relator's contribution rate to the unemployment compensation fund. That may very well be true, but it strikes us that it is an argument which more properly should be addressed to the legislature than to the courts. Likewise, relator argues that payment of benefits gives the employe double benefits or double pay in allowing her to receive severance pay and at the same time collect unemployment benefits. That may or may not be true, depending upon the construction placed upon the nature of the severance pay. In any event, it is true, irrespective of the employment status of the employe after separation. If she procured a new position the day after separation, she would retain her severance pay and the wages so earned, and no one would contend that she should not be allowed to retain both. Unemployment compensation is merely intended to take the place of wages which could have been earned had she been employed." (*Ackerson* v. *Western Union Tel. Co.*, 234 Minn. 271 [48 N.W.2d 338, 340-342].)

To the same effect are *Western Union Tel. Co.* v. *Texas Emp. Com.*, (Tex.Civ.App.) 243 S.W.2d 217; *Dubois* v. *Maine Emp. Security Com.*, —— Me. —— [114 A.2d 359]; see *Keystone Mining Co.* v. *Unemployment Comp. Board of Review*, 167 Pa.Super. 256 [75 A.2d 3]. It has been well said in approving the Ackerson case, *supra*: "First, need or actual indigency is not a requirement for eligibility for compensation. Receipt of income from other sources does not disqualify a claimant, for the purpose of these laws is to supplement a person's resources during periods of unemployment. Second, the claimant concededly would have received the severance payment even if she had obtained a new job immediately upon dismissal. Third, the contract specifi-

cally provided that acceptance of separation pay would terminate the employee's service with the company—rendering further untenable the company's position that the severance pay was in fact wages paid for the weeks subsequent to dismissal. Fourth, the reasons for unions seeking the inclusion of a severance-payment clause in working agreements extend beyond a mere attempt to ease the employee's immediate financial burden while looking for a new job. Severance pay is also intended as partial compensation for loss of seniority rights, loss of possible pension rights, and compensation for retraining or acquiring new skills, the latter being especially applicable in the present case. From the employer's viewpoint, severance pay clauses are included as a means of maintaining good will, both as to workers and to the community. These factors strongly suggest that the parties to the contract intended the severance payment clause to have no relation to the worker's employment status after dismissal, and, more significantly, that the court reached the proper result in concluding that, in view of the terms of the contract, there should be no relation between eligibility for unemployment compensation and receipt of severance pay.'' (100 U. Pa.L.Rev. 144, 145; see also 64 Harv.L.Rev. 681.)

The question here involved has broad implications in view of the so-called guaranteed annual wage arrangements which have been made notably in the automobile industry. In the Ford contract for illustration, there is a provision for payment to the employee when involuntarily laid off and such payment is defined as a supplementation which means the right to receive both payment from the employer and unemployment compensation from the state without reduction. Under unemployment insurance laws similar to ours, the state officials have said that such supplementation is proper in Connecticut, Delaware, Massachusetts, Michigan, New Jersey and New York. (2 C.C.H. Unemp. Ins. Rep. (Conn.) para. 8380; *id.* (Del.) para. 8088; 4 *id.* (Mass.), para. 8188; *id.* (Mich.) para. 8522; 5 *id.* (N.J.) para. 8271; 36 Lab. Rel. Rep. 715; 69 Harv.L.Rev. 362.) The attorney general of this state ruled on February 10, 1956, that the employer's payment under the Ford plan does not render the employee ineligible for unemployment compensation under our law. (27 Ops. Cal. Atty. Gen. 71.) The common theory in those determinations is that the payments by the employer are not wages paid with respect to the week for which unemployment compensation is sought. These official rulings should not be lightly brushed

aside to the end that the guaranteed annual wage contracts, insofar as they purport to confer a benefit upon the employee, will be meaningless.

I would reverse the judgment.

Gibson, C. J., and Traynor, J., concurred.

Appellant's petition for a rehearing was denied June 27, 1956. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.