IN THE MATTER OF W. L. TYSON S. S. #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 CLAIMANT-EMPLOYEE, ET AL.
AND
SWIFT & COMPANY ROCKY MOUNT, N. C.

(Filed 20 January, 1961.)

1. **Master and Servant § 97—**

The Employment Security Law must be construed to promote and not to defeat the legislative policy as declared in the statute, and the courts will not construe the Act in such manner as to discourage parties from entering into contracts designed to lessen the hardships incident to termination of employment. G.S. 96-2.

2. **Master and Servant § 105— Severance and vacation pay must be considered in determining unemployment benefits.**

Discharged employees who are entitled under the contract of employment to severance and vacation pay are not entitled to unemployment compensation until the moneys paid as severance and vacation pay have been exhausted by weeks elapsed at the employees' weekly wage rate, since such severance and vacation pay constitute "wages" within the purview of G.S. 96-8(13)a, and since such employees are disqualified under G.S. 96-14(8), it not being the policy of the law that an employee should receive by reason of unemployment a weekly sum in excess of what he would receive if employed. Retirement pay received by an employee comes within the same category.

APPEAL by Swift & Company from *Hobgood, J.,* March 1960 Civil Term, of EDGECOMBE.

This is an appeal from a judgment affirming an order of the Employment Security Commission awarding unemployment benefits to twenty-two former employees of Swift & Company (hereafter designated as Swift) from the time they filed claims and registered for work, notwithstanding vacation and severance payments made by Swift when the employment terminated.

*Battle, Winslow, Merrell, Scott & Wiley for appellant.*
*W. D. Holoman, R. B. Billings, and D. G. Ball for the Employment Security Commission of North Carolina.*

RODMAN, J.  The appeal requires an interpretation of our Employment Security Law (G.S. c. 96) and the application of that interpretation to the facts.

These are the facts: Swift had for many years operated a plant at Rocky Mount. It built a new and larger plant at Wilson. In the fall of 1958 it began to reduce its operation at Rocky Mount. Because of this reduction it was not able to provide all of its regular employees with regular work. During the summer and fall of 1958, some of its employees applied for and were awarded unemployment benefits. They were not, however, permanently separated from employment by Swift until March 1959.

In the spring of 1959 Swift decided to terminate its operation at Rocky Mount. It notified its employees of its decision and, on 25 March 1959, terminated the employment of fourteen claimants, including those whose work periods had previously been irregular. It continued some in employment until the latter part of June 1959 when employment of the remaining eight claimants was terminated.

United Packing House Workers of America, a labor organization, was the labor representative of Swift's employees at Rocky Mount. It and Swift had, prior to 1959, entered into a contract by which Swift was obligated for severance pay to its employees "who are permanently separated from the service either because of a reduction in forces arising out of the closing of a department or unit of the business or because of technological change in production adopted by the Company and when it is not expected that they will be reemployed."

The amount of severance pay to which an employee was entitled upon permanent separation from the company's rolls was computed on length of service and weekly wage. It was not payable:

"1. To employes with less than one (1) year's continuous service;

"2. To employes laid off in gang reductions;

"3. In cases where the employe was discharged for cause;

"4. In cases of voluntary resignation;

"5. In cases of employes retired on pension;

"6. To employes who refuse an offer of employment by the Company in the same sales unit or in another unit of its business, the location of which is reasonably accessible to the location of the place of employment from which the employes are being dropped from the service."

The amounts payable upon termination of employment were payable:

"1. If less than the equivalent of four (4) week's pay — in one lump sum.

"2. Amounts over a total of four (4) weeks' pay — weekly installments of full wages until the total amount is exhausted. The employe may, at his option, elect to receive such amount in a shorter period of time or in one lump sum.

"3. In the event of death, any unpaid balance shall be paid to the widow or dependents."

The contract also provided for annual paid vacations. The length of vacation to which an employee might be entitled was based on length of service. The amount of vacation pay was duration of vacation multiplied by weekly wage. When an employee had qualified for vacation, the amount owing was payable notwithstanding his death prior to payment. An employee could not continue to work and draw vacation pay. Termination of employment did not defeat employee's right to vacation pay.

When employment was terminated, Swift paid claimants their severance and vacation pay as provided in the contract. The severance pay ranged from $249.60, equivalent to three weeks' wages, to $1407.60 equivalent to eighteen weeks' wages. The vacation pay ranged from $78.20, equivalent to one week's wage, to $334.40, equivalent to four weeks' wages.

Claimants who had, prior to the termination of employment, filed claims had received unemployment benefits varying from $96, representing three weeks of unemployment benefits, to $719, representing twenty-four weeks of unemployment benefits.

Upon termination of employment, claimants filed claims with the Commission for "benefits," contending they were presently entitled thereto. Swift denied the claim, asserting they were not entitled to benefits before the expiration of a waiting period ascertained by dividing the sum of vacation and severance pay by the amount earned per week when at work. Hence the sole question for determination is: Can claimants disregard the amounts paid to them under the terms of their contract and immediately begin the collection of unemployment benefits?

The severe economic depression of the early 1930s produced national legislation known as the Social Security Act. It was designed to ease economic strain produced by causes beyond the control of the individual. The loss of income because of involuntary unemployment was one of the hardships to be eased. To lighten this burden, payroll taxes levied by the Federal Government would in large part

be returned to those States which enacted laws to accomplish the declared purpose of the Federal statute. 42 USCA 502.

To secure to employees residing in North Carolina the benefit of the Social Security Act, Governor Ehringhaus called an extra session of the General Assembly for December 1936. That session enacted only two laws: one, merely extending the time within which revenue bonds theretofore authorized could be issued; the other was a comprehensive act designed to secure for North Carolina workmen the benefits of Federal legislation. C. 1, P.L., Extra Session 1936. That Act, as subsequently amended, is now known as the "Employment Security Law." It appears as c. 96 of our General Statutes.

The Legislature, when it acted in 1936, incorporated in the Act the reason for the legislation and the guide for interpretation. It said: "Economic insecurity due to unemployment is a serious menace to the . . . welfare of the people of this State. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action . . . to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. *This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance.*" (Emphasis supplied.) Sec. 2, c. 1, P.L., Extra Session 1936.

The Legislature has, in the twenty-four years which have intervened since the statute was originally enacted, amended it as experience has shown necessary to accomplish its declared purpose, but no change has been made in the declared purpose and rule for interpretation as originally given. G.S. 96-2.

To accomplish the declared purpose, employers are required to contribute to a fund for the protection of their employees who may lose employment. The amount which an employer is required to contribute to this fund is based on his employment record. G.S. 96-9.

An individual who performs no work and to whom no wages are payable for any week is totally unemployed. G.S. 96-8(11). An eligible individual who is unemployed is entitled to benefits from the fund created by the tax imposed on employers' payrolls. G.S. 96-12.

The weekly amount, called weekly benefit, which one may receive from the fund is determined by wages earned during the period of employment. G.S. 96-12(b) (2). The weekly benefit is a fraction of

weekly wage. The weekly benefit paid these claimants when temporarily unemployed was less than 50% of their weekly wage. Such amounts as they may receive because of unemployment resulting from abandonment of operations will be less than 50% of their weekly wage. The period during which an unemployed person may receive benefits in any benefit year is limited to twenty-six weeks. G.S. 96-12(d).

Unemployment resulting in economic hardship may result from either of two causes: (1) temporary reduction of work force or temporary shutdown because of lack of orders, for repairs, or other temporary causes; (2) a permanent termination of the relationship due to abandonment of operations or permanent reduction of working force, voluntary act of the employee, or because of the misconduct of an employee resulting in his discharge. Some of present claimants have been confronted with the hardships resulting from loss of income produced by temporary unemployment, all with the hardship resulting from unemployment caused by complete severance of the relationship of employer and employee.

The parties did not, in their contract, undertake to reduce the hardship resulting from temporary unemployment; but, mindful of the philosophy of the Employment Security Act that the hardship of unemployment could at least be reduced "by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods  of employment to provide benefits for periods of unemployment," Swift and claimants, acting through their bargaining agents, agreed that where a permanent termination of employment should occur, the employer would pay to the employee a sum equal to the weekly wage of the employee when at work multiplied by a number of weeks, ascertained by the years of continuous service.

The contract requires the payment of this sum irrespective of when the employee may find new employment. If he dies before the sum is paid to him, his widow or dependents receive it. A persual of the contract provisions can leave no doubt that the parties intended to accomplish the laudatory purpose declared in the Employment Security Act. The statute and the contract follow different paths to accomplish the desired purpose. The contract provisions are more favorable to the employee. Under the statute the employee draws only a fraction of the amount paid as wages and cannot draw this sum for more than twenty-six weeks. Under the contract he draws a sum equivalent to his weekly wage for a period based on his past services. Swift paid one of the claimants severance pay for 19½

weeks plus three weeks of vacation pay. The amount so paid is substantially more than he could receive as unemployment benefits. Notwithstanding the payments so made, he may, if still unemployed at the expiration of 22½ weeks (the period covered by severance and vacation pay) collect unemployment benefits for the full statutory amount. The statute negatives the idea that the employee should receive, because of unemployment, a weekly sum in excess of the amount which he would receive if employed.

Under the statute, to be eligible for benefits, claimant must register for work with the Commission and be able to work and available for work. G.S. 96-13. No such conditions are imposed by the contract. Notwithstanding sickness, injury, or other cause rendering him unable to work or because other employment has been promptly secured, he is entitled to receive his compensation as provided in the contract. Courts ought not to defeat legislative policy by construing contracts between employer and employee in such manner as to discourage parties from entering into contracts designed to promote a public policy plainly and specifically enunciated by the Legislature.

One is not entitled to unemployment benefits merely because he meets the legislative definition of "totally unemployed." G.S. 96-8(11). He must also meet the statutory requirements of eligibility, G.S. 96-13, and he must not be disqualified for benefits, G.S. 96-14. This section of the statute enumerates eight conditions which disqualify an unemployed individual from receiving statutory benefits. The first three subdivisions of the section not only disqualify but contain penalty provisions. Subsection 4 disqualifies when unemployment is caused by a labor dispute. None of these provisions are applicable to this case. Subsection 5, in substance a part of the original Act, provides: "For any week with respect to which he is receiving or has received remuneration in the form of remuneration in lieu of notice."

The National Labor Relations Act vests the National Labor Relations Board with broad discretion in dealing with controversies between employer and employee. In *Marshall Field & Co. v. National Labor Rel. Bd.*, 318 U.S. 253, 87 L. ed. 744, the Supreme Court held that benefits "received under the state compensation act were plainly not 'earnings' which under the terms of the Board's order, could be deducted from the back pay awarded." The question there answered is the converse of the question here presented. The decision of our highest Court was reaffirmed in *National Labor Rel Bd. v. Gullett Gin Co.*, 340 U.S. 361, 95 L. ed. 337. The Court there expressly declared that the power of the National Labor Relations Board to act was not restricted by State unemployment compensation laws.

Following these decisions, our Legislature amended the definition of "wages." The original definition was: "All remuneration payable by employers for employment." C. 1, sec. 19(m), Public Laws, Extra Session 1936. In 1953 the definition was changed to read: ". . . all remuneration for services from whatever source." C. 401, S.L. 1953, G.S. 96-8(13). The Legislature did not then deem it necessary to extend the class of acts which would defer employees' right to unemployment benefits.

Not satisfied that the 1953 amendment to the definition sufficed to prevent payment of benefits when an employee was receiving wages, whether by order of the National Labor Relations Board or pursuant to contract provisions with his employer, the Legislature in 1955 again redefined "wages." It now includes "commissions and bonuses and any sums paid to an employee by an employer pursuant to an order of the National Labor Relations Board or *by private agreement, consent* or arbitration for loss of pay by reason of discharge. . ." (Emphasis added.) C. 385, S.L. 1955, G.S. 96-8 (13)a. Not content with redefining "wages," the 1955 Act added a new subsection to the disqualifying provisions. It said an employee should not be entitled to compensation benefits "for any week with respect to which he has received any sum from the employer pursuant to an order of the National Labor Relations Board or *by private agreement,* consent or arbitration *for loss of pay by reason of discharge. When the amount so paid by the employer is a lump sum and covers a period of more than one week, such amount shall be allocated to the weeks in the period of a pro rata basis.* . . G.S. 96-14(8). (Emphasis supplied.)

The fact that the Legislature not only amended the definition of "wages," but added a disqualifying provision is, we think, clear evidence of its intent to prevent the collection of unemployment benefits so long as the employee had vacation or severance pay payable to him. It is a clear declaration that the Legislature did not intend that an employer should be required to provide greater compensation to an unemployed individual than to the same individual when at work.

Under the 1955 definition of "wages," Swift has been required to pay Social Security taxes including unemployment taxes on the sums paid claimants because of its contractual obligations. If the sums so paid are taxable because they are wages, it would seem they should qualify as wages under the definition of unemployment and other provisions of the Act.

Claimants contend the moneys paid pursuant to the contract had no relation to their unemployment but were the payment of a debt

for past services. This contention is without merit. It ignores the express language of the contract. If, as claimants argue, the payments were a debt owing for past services, a voluntary termination of the relationship would not discharge the debt nor would a discharge for cause; but the contract by express language declares claimants are not entitled to the moneys in either of these events. They have no right to collect under the contract unless they meet its express provisions and there is a total and permanent termination of the relationship due to no fault of theirs.

Claimant Daniel McClain was paid for a four weeks' vacation and given a gratuity of $688.80, equal to eight weeks' wages, which payments sufficed to bring him in the class of employees entitled to retirement pay. We think these payments to him fall in the same category as the payments made to the other claimants.

The excellent briefs furnished by the parties have been helpful in reaching a decision. We have given careful consideration to the cases cited in them. We have made an independent research. Decisions by the various courts called upon to consider the question here presented are reviewed in *Globe-Democrat Pub. Co. v. Industrial Commission*, 301 S.W. 2d 846. We concur in the statement there made: "The only definite conclusion that can be reached from an analysis and consideration of the authorities in other jurisdictions is that there is a complete lack of unanimity of opinion on the basic question here presented." The divergent conclusions are in part due to statutory differences.

Our conclusion that claimants are disqualified for benefits until the moneys paid by Swift have been exhausted by weeks elapsed at the employees' weekly wage rate is supported by *Globe-Democrat Pub. Co. v. Industrial Commission, supra* (Mo.); *Schenley Distillers v. Review Board of Ind. Emp. S.D.*, 112 N.E. 2d 299 (Ind.); *Santus v. Unemployment Compensation Bd. of Review*, 110 A 2d 874 (Pa.); *General Electric Co. v. Unemployment Comp. Bd. of R.*, 110 A 2d 258 (Pa.); *Wheatland Tube Co. v. Unemployment Comp. Bd. of Rev.*, 142 A 2d 772 (Pa.); *Fazio v. Unemployment Compensation Board of Review*, 63 A 2d 489 (Pa.); *Krupa v. Western Union Tel. Co.*, 103 N.E. 2d 784 (Ohio); *Kalen v. Director of Division of Employment Security*, 136 N.E. 2d 257 (Mass.); *Cerce v. Director of Division of Employment Security*, 128 N.E. 2d 793 (Mass.); *Bradshaw v. California Employment Stab. Com'n.*, 297 P 2d 970 (Cal.).

Contrary conclusions were reached in *Kroger Company v. Blumenthal*, 148 N.E. 734 (Ill.); *Dubois v. Maine Employment Security Commission*, 114 A 2d 359 (Me.); *Western Union Tel. Co. v. Texas*

*Employment Com'n.*, 243 S.W. 2d 217; *Ackerson v. Western Union Tel. Co.*, 48 N.W. 2d 338, 25 A.L.R. 2d 1063 (Minn.); *Meakin v. Huiet*, 112 S.E. 167 (Ga.).

For the reasons we have given we conclude our statute defers claimants' right to unemployment benefits until the lapse of the periods for which payments were made.

Reversed.