THORNBROUGH, COMMR. *v.* GAGE.

5-2503                                    350 S. W. 2d 306

Opinion delivered October 23, 1961.

[Rehearing denied November 13, 1961.]

*Luke Arnett,* for appellant.

*McMath, Leatherman, Woods & Youngdahl,* for appellee.

GEORGE ROSE SMITH, J. This is an application by the twenty-two appellees, former employees of the American Can Company, for unemployment compensation. The appellees were thrown out of work when the company permanently shut down and discontinued its Fort Smith plant in November, 1958. Under the collective bargaining agreement between the company and its employees all of the appellees received substantial lump sum severance payments in connection with the termination of their employment. The principal question in the case is whether this severance pay constituted a "dismissal payment" that would disqualify the appellees

from immediately receiving unemployment compensation from the state. Ark. Stats. 1947, § 81-1106 (f). The highest administrative tribunal, the Board of Review, held that the employees' receipt of severance pay had no adverse effect upon their right to immediate compensation. The circuit court affirmed the board's decision.

The labor agreement between the American Can Company and the United Steelworkers of America appears in the record as a printed pamphlet of more than 150 pages. It is binding upon the company and its employees at some fifty plants scattered over more than a dozen states. We mention only the pertinent provisions in this carefully drawn document.

The contract protects the employees against being discharged without cause, but it recognizes the fact that workmen will be laid off from time to time. Seniority governs the order in which men are laid off and recalled to work. The contract contains a Supplemental Unemployment Benefit plan (called SUB) under which these appellees received severance pay.

The SUB plan is directed primarily toward supplementing the unemployment compensation that will be received by idle employees during layoffs. To this end the company agrees to establish a SUB trust fund to be administered by one or more banks as trustees. The company is to build up the fund by making contributions at the rate of five cents an hour for all of its employees' working hours. A formula is provided for determining the maximum level at which the fund will be maintained by the company.

The principal purpose of the SUB plan is to provide additional income to employees receiving unemployment compensation during layoffs. In order to qualify for weekly SUB payments an employee must be eligible for state unemployment compensation; that is, he must register at the local employment office, accept suitable work when offered, etc. If the company protests the employee's application for unemployment compensation

the SUB payments are to be withheld until the protest has been finally determined.

When an employee is drawing unemployment compensation from the state during a layoff he is also entitled to weekly payments from the SUB trust fund. The amount of these weekly SUB payments depends upon the employee's average weekly wages during the preceding year and also upon the amount of unemployment compensation that he is receiving from the particular state where he lives. The SUB plan sets out an exact schedule of weekly payments. We may roughly summarize that schedule by saying that the employee's state unemployment compensation is first taken into account and is then supplemented by a weekly SUB payment that brings the employee's total income up to about 55 per cent of his pay at the time he was laid off. The SUB plan recites that its purpose is "to supplement state system unemployment benefits to the levels provided herein, and not to replace or duplicate them."

The number of weeks for which an employee is entitled to draw SUB payments depends upon the length of his service with the company. Broadly speaking, an employee accumulates one unit of SUB credit for each two weeks of company service, with a maximum allowable credit of 52 units. When an employee is laid off each unit of SUB credit entitles him to one weekly SUB payment, until his credits are exhausted. The limit of 52 credits means that the weekly SUB payments cannot exceed one year.

The employees make no contributions to the SUB trust fund; it is built up entirely by the company's contributions. The labor agreement does not contemplate that any employee will acquire a vested interest in the fund in the sense that the employee's estate will be entitled to any payment from the fund at the employee's death. There is, however, one provision for lump sum benefits, which is the center of contention in this case. This provision reads as follows:

"If . . . the Company shall decide to close completely and permanently any plant covered by this Agreement, an employee whose job is discontinued, and who does not retire under the Pension Plan in effect between the parties, or transfer to another plant of the Company, will have his credit units converted into a single severance payment determined in accordance with . . . this Agreement. This single severance payment will be paid to such employee in a lump sum at the time of his termination."

This provision came into play in the case at bar. When the company's Fort Smith plant was discontinued the various appellees became entitled to receive, and did receive, lump sum severance payments from the company. The testimony of one of the appellees, O. D. Bryson, was offered as a typical case. Bryson had worked for the company for more than ten years, had never drawn weekly SUB payments, and thus was entitled to the maximum 52 units of credit. In accordance with the contract this credit was converted into a lump sum payment of $2,053, which Bryson received. The other appellees are similarly situated.

The first question is whether the lump sum severance payments constituted disqualifying dismissal payments under the statute. The governing act provides that an employee shall be disqualified for unemployment benefits "[f]or any week with respect to which he receives or has received remuneration in the form of:

"(1) Dismissal payments.

"(2) Unemployment benefits under any unemployment compensation law of another state or of the United States.

"(3) Vacation pay.

"(4) Compensation for retirement provided by an employment contract or agreement. . . ." Ark. Stats., § 81-1106 (f).

The term "dismissal payment" does not have a recognized and established legal meaning. Our legisla-

ture evidently intended for the term to mean something more than wages paid in lieu of notice, for Act 155 of 1949 provided that an employee would be disqualified for benefits if he received wages in lieu of notice *or* dismissal payments. The use of both phrases indicates that they are not considered to be synonymous. It has been pointed out that dismissal ''connotes an affirmative action on the part of the employer in initiating the separation.'' *Dubois* v. *Maine Emp. Sec. Comm.,* Maine, 114 Atl. 2d 359.

We preceive no difficulty in defining a ''dismissal payment,'' for both words are too familiar to be misunderstood or to be considered ambiguous. In the field of employment to dismiss is to discharge. These appellees were discharged by the company when the Fort Smith plant was shut down. Their discharge was the sole reason for their receiving lump sum payments under the SUB plan. When the language of the statute is given its plain and ordinary meaning it cannot be doubted that dismissal payments are involved in this case.

Counsel for the appellees suggest several divergent reasons for saying that these lump sum payments were not dismissal pay, but we do not find the arguments to be persuasive. It is said that the SUB plan refers to ''severance payments,'' which shows that dismissal payments were not intended. The question, however, is what the legislature meant in selecting the term dismissal payments. If these payments fall within that definition, as they do, it is immaterial that the parties preferred the word severance to the word dismissal. We must look to substance rather than to nomenclature.

It is also said in the appellees' brief that a characteristic of a disqualifying dismissal payment may be that the employee does not have a vested right to the payment. It is true that some statutes refer to dismissal payments ''which the employer is not legally required to make.'' See *Industrial Comm.* v. *Sirokman,* Colo., 306 P. 2d 669; *Ackerson* v. *Western Union Tel. Co.,* 234 Minn. 271, 48 N. W. 2d 338, 25 A. L. R. 2d 1063. Our

statute, however, like those in many other states, does not contain such a restriction. Indeed, in the next breath our legislature referred to "vacation pay" as having a similar disqualifying effect. We know, of course, that collective bargaining contracts often give the employees a vested right to vacation pay; such a provision appears in the contract now before us. If the legislature was willing to disqualify a person on account of his receiving vacation pay as a matter of right there is no basis for supposing that the lawmakers had a different intention with respect to dismissal pay that accrued as a matter of right.

It is also argued that the appellees should be regarded as having received these dismissal payments as beneficiaries of the SUB trust rather than as former employees of the company. Even so, the funds in the trust were wholly contributed by the employer, and the appellees had no vested right to a lump sum payment except in connection with their dismissal. We do not perceive that the mere interposition of a bank as trustee has any substantive effect upon the character of the dismissal payment. Pension plans are frequently administered by trustees, but in certain cases our statute disqualifies the recipient of a pension from being eligible for unemployment compensation. Ark. Stats., § 81-1106 (f) (4). Again there is no good reason to think that the lawmakers had conflicting intentions about two similar matters.

The second and more difficult question in the case is that of determining the number of weeks for which these dismissal payments disqualified the appellees from receiving unemployment compensation from the state. The statute provides that an individual is disqualified "[f]or any week with respect to which he receives or has received remuneration" in the form of dismissal payments. Ark. Stats., § 81-1106(f). The appellant contends that each appellee should be disqualified for a number of weeks equal to the number of credit units that were converted into severance pay. On this basis Bryson, for example, would be disqualified for 52 weeks.

The appellees insist that they should not be disqualified at all, for the reason that the dismissal payments were not made ''with respect'' to the weeks following their dismissal by the company.

Hardly any of the cases cited in the briefs are really in point. Many state statutes, including ours, define unemployment by saying that an individual shall be deemed unemployed ''with respect to any week during which he performs no services and with respect to which no wages are payable to him.'' Ark. Stats., § 81-1103 (m). Under such statutes it is usually held that weekly or lump sum SUB payments do not prevent a person from being unemployed, since the payments are referable to his prior employment rather than to the period of his idleness. *Industrial Comm.* v. *Sirokman,* Colo., 306 P. 2d 669; *Kroger Co.* v. *Blumenthal,* 13 Ill. 2d 222, 148 N. E. 2d 734; *Dubois* v. *Maine Emp. Sec. Comm., Maine,* 114 Atl. 2d 359; *Ackerson* v. *Western Union Tel. Co.,* 234 Minn. 271, 48 N. W. 2d 338, 25 A. L. R. 2d 1063; *Western Union Tel. Co.* v. *Texas Emp. Comm.,* Tex. Civ. App., 243 S. W. 2d 217; contra, *Bradshaw* v. *Calif. Emp. Stabilization Comm.,* 46 Calif. 2d 608, 297 P. 2d 970.

We have no quarrel with these decisions, but they do not reach the question now before us. The cited cases were concerned with the fact of unemployment rather than with the disqualifying effect of dismissal payments. (In the *Ackerson* case the court cited a dismissal payment provision but did not rely upon it in reaching its conclusion.) The language of the two statutory sections differs in that § 81-1106 (f) refers to any week with respect to which the individual receives *or has received* remuneration.

On the basis of the cases cited above the appellees argue that these dismissal payments were paid ''with respect to'' the years of their employment rather than with respect to the weeks following their discharge. If this were true no schedule of severance pay could ever be graduated according to length of service, for it would then always be referable to the prior employment.

Under our statute this suggestion is effectively rebutted by the fact that the legislature provided a disqualification for the receipt of vacation pay. In the case of a discharged employee who has accumulated vacation time such pay may be similar to the appellees' severance pay in being received as a matter of right, in being graduated according to length of service, and in being paid in a lump sum rather than in weekly installments. Yet the legislature plainly intended for the recipient of vacation pay to be ineligible for unemployment compensation during the period of his paid holiday. We are unable to distinguish that situation from the case at hand.

All the arguments now urged by the appellees were effectively answered in *Globe-Democrat Pub. Co.* v. *Industrial Comm.*, Mo. App., 301 S. W. 2d 846, which we consider to be directly in point. There the claimant had been discharged after twelve years of service. Under the collective bargaining contract between his union and the employer he was entitled to dismissal compensation amounting to twenty-four weeks' pay. He received what the court refers to as "a lump sum dismissal payment" in the amount of $1,825.75. The statute was similar to ours except that it used the phrase "termination allowances" instead of dismissal pay. The administrative commission held that the claimant was disqualified only for the one week in which he received the lump sum payment. In reversing that decision and holding that the claimant was disqualified for the full period of twenty-four weeks the court discussed the principal cases now cited by the appellees and considered the contentions that are now urged. We may conclude this part of our discussion by saying that we thoroughly agree with the reasoning and the conclusions of the Missouri court.

Although we hold that the dismissal payments had a disqualifying effect we are not convinced that the disqualification should be as extensive as the appellant contends. He insists that Bryson, for instance, should be disqualified for a full year merely because 52 units of

credit were converted into the lump sum payment that he received.

This position is not sound. The labor contract provides that the credit units shall have no fixed value in terms of time or money. When the SUB trust fund is below its maximum level the SUB payments are proportionately reduced and may be as little as 10 per cent of the amounts ordinarily payable. Thus to approve the appellant's argument might mean that a modest dismissal payment would result in a prolonged disqualification. Such a narrow view would not be consistent with the liberal interpretation that the act is entitled to receive. Ark. Stats., § 81-1102.

In some states the statutes provide that dismissal pay and the like be allocated to those weeks to which it can reasonably be considered to apply. *Schenley Distillers* v. *Review Board,* 123 Ind. App. 508, 112 N. E. 2d 299; *Kalen* v. *Director Div. Emp. Sec.,* 334 Mass. 503, 136 N. E. 2d 257. Our statute accomplishes the same purpose by directing that the claimant be disqualified with respect to any week for which he has received remuneration in the form of dismissal pay, vacation pay, etc. The legislature obviously intended that this remuneration should be allocated in a reasonable and appropriate manner.

The dismissal payments in this case were calculated upon the basis of the appellees' average wages during the year preceding their dismissal. We are of the opinion that the disqualification should be computed in the same manner; that is, each appellee should be disqualified only for the period of time for which his dismissal payment equals the payment in full of his wages at the average rate. This procedure gives effect to the basic intent of the statute and is manifestly fair to both the employer and the employee. The employee is protected against the economic burden of unemployment, while the employer is not penalized for having provided the funds for the dismissal payments.

Since the proof with reference to the claimants' average earnings and lump sum payments was not fully developed the cause will be remanded through the circuit court for further proceedings consistent with this opinion.

Reversed.

HARRIS, C.J., and JOHNSON, J., would affirm the judgment but do not join in the dissenting opinion of McFADDIN, J.

ED. F. McFADDIN, Associate Justice, dissenting.

I would affirm the judgment in its entirety, rather than reverse and remand for further calculations. The big question in this case was whether the receipt of severance pay under the "SUB" contract was the same as "dismissal payments" under § 81-1106 (f) (1) Ark. Stats. The Majority Opinion has held—and I think quite correctly—that severance payments under the "SUB" contract are the same as dismissal payments under our said statute. But the Majority has gone further and has held: (a) there must be a determination of the average weekly wage of the worker for the year preceding his dismissal; and (b) such average wage must be divided into the amount of the dismissal payment in order to determine the number of weeks for which the worker is disqualified from receiving unemployment compensation benefits under our statute, which is § 81-1101 Ark. Stats. This formula, worked out by the Majority for calculating the number of disqualifying weeks, is—to my way of thinking—nothing but *judicial legislation,* because I find nothing in the statute that prescribes such a formula.

These appellees, who were dismissed by the American Can Company because it permanently closed its plant in Fort Smith, received severance benefits under a contract with the American Can Company. These severance benefits had no reference to the weeks for which such worker would be unemployed: the severance benefits were accumulated for weeks in which the worker had previously been employed. The benefits were pay-

able in a lump sum at the termination of employment because of an eventuality (termination), with no reference to how many weeks the appellees would be out of employment. The *severance benefits* under the "SUB" contract were entirely different from the additional benefits that the worker would receive for a *temporary lay-off*. This is clear to me by reading the contract between the Steel Workers' Union and the American Can Company. The "SUB" contract, giving the employees of the American Can Company severance payments in the event the factory was permanently closed, was nothing but a form of accident insurance payment and bears no relation to the unemployment benefits that the employees should receive under the statute.

The Majority Opinion is *judicial legislation* because it is legislating something into the Arkansas statute that has been placed in the statutes of other States by the Legislatures, but which is now being placed in the Arkansas statute by this opinion of our Court. A case discussed in the consultation, but not cited in the Majority Opinion, is the North Carolina case of *In Re Tyson*, decided by the Supreme Court of North Carolina in January, 1961, and reported in 253 N. C. 662, 117 S. E. 2d 854; and the formula that the Majority has worked out for calculation in the case at bar is the formula set forth by the Supreme Court of North Carolina in the *Tyson* case. But the interesting thing about the *Tyson* case is, that it was decided under a statute which specifically said: "When the amount so paid by the employer is in a lump sum and covers a period of more than one week, such amount shall be allocated to the weeks in the period on a pro rata basis. . . ." That provision in the North Carolina statute did not exist in the original North Carolina Employment Security Act adopted in 1936, but was added to the North Carolina statute by an Act of 1955 (see Session Laws of North Carolina for 1955, Chap. 385, § 8). The Arkansas Employment Security Act, as found in § 81-1106 Ark. Stats., does not have any such provision in it as does the North Carolina statute which was construed in the *Tyson* case. So I think the Majority

is applying, by judicial legislation, the North Carolina rule which that State adopted by legislation. It might be a good way to figure out the period of disqualification, but it should be done by the Legislature and not by this Court.

The question before us was whether the receipt of severance pay under the "SUB" contract was the same as dismissal pay, and whether such severance pay was disqualifying from unemployment compensation benefits allowed by our statute. I reach the conclusion that severance pay is the same as dismissal pay, but it is not disqualifying because we have no statute which indicates a proration calculation method as the Majority has done.

Therefore, I would affirm the judgment of the Circuit Court.